**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* TAMIKA MILLER, and TAMIKA MILLER individually, | |
| Plaintiffs, | |
| v. | 19 Civ. 10970 (DLC) |
| CITIGROUP INC., CITIBANK, N.A., CITIBANK INC., DOE CORPORATIONS 1-10, | |
| Defendants. | |

### MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO RELATOR TAMIKA MILLER'S MOTION FOR AN AWARD OF A *QUI TAM* RELATOR'S SHARE

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

REBECCA S. TINIO
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2774
Fax: (212) 637-2686
Email: rebecca.tinio@usdoj.gov

**Table of Contents**

Preliminary Statement ....................................................................................................1

Background ....................................................................................................................1

I.      The OCC's 2015 and 2020 Enforcement Actions Against Citibank ................................1

        A.  The 2015 Orders and 2018 Termination ........................................................2

        B.  The 2020 Orders ............................................................................................3

II.     Relator's Complaint to OCC ..........................................................................................5

III.    Relator's *Qui Tam* Lawsuit and the Government's Investigation .....................................7

Argument .......................................................................................................................9

I.      The FCA's Alternate Remedy Provision .........................................................................9

II.     Relator Is Not Entitled to a Share of the 2020 CMP ..................................................... 10

        A.  The 2020 Orders Were Not the Government's Alternate Remedy For Redressing
            Relator's *Qui Tam* Allegations ..................................................................... 11

        B.  Relator Has Not Established an Entitlement to Any Relator's Share Because Her
            *Qui Tam* Lawsuit Is Pending and There Has Been No Finding of FCA Liability ...... 15

        C.  Relator's *Qui Tam* Complaint Does Not State a Valid FCA Claim .......................... 17

Conclusion ................................................................................................................... 19

## Table of Authorities

<u>Cases</u>                                                                                                                <u>Page:</u>

*Guardiola ex rel. United States v. United States,*
   845 F. App'x 707 (9th Cir. 2021) ........................................................................ 14

*Rille v. PriceWaterhouseCoopers LLP*
   803 F.3d 368 (8th Cir. 2015) ........................................................................... 12

*Ubl v. Savin Corp.,*
   217 F. App'x 237 (4th Cir. 2007) ..................................................................... 15

*United States ex rel. Barajas v. United States,*
   258 F.3d 1004 (9th Cir. 2001) ............................................................... 10, 12, 14

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
   501 F.3d 493 (6th Cir. 2007) ........................................................................... 12

*United States ex rel. Hefner v. Hackensack Univ. Med. Cent.,*
   495 F.3d 103 (3d Cir. 2007)............................................................................. 15

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.,*
   929 F.3d 721 (D.C. Cir. 2019) ......................................................................... 18

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,*
   985 F.2d 1148 (2d Cir. 1993)............................................................................. 8

*United States ex rel. LaCorte v. Wagner,*
   185 F.3d 188 (4th Cir. 1999) ........................................................................... 10

*United States ex rel. Simoneaux v. E.I. DuPont de Nemours & Co.,*
   843 F.3d 1033 (5th Cir. 2016) ......................................................................... 18

*United States ex rel. Ubl v. United States,*
   2006 WL 1050650 (E.D. Va. Apr. 18, 2006) ................................................. 15

*United States v. Novo A/S,*
   5 F.4th 47 (D.C. Cir. 2021) ...................................................................... 12, 13

<u>Statutes</u>

12 U.S.C. § 1 ......................................................................................................... 1

12 U.S.C. § 1818 ................................................................................................... 2

12 U.S.C. § 1833a ................................................................................................. 7

31 U.S.C. § 3729 ........................................................................................................... 7

31 U.S.C. § 3729(a) ............................................................................................... 16, 17

31 U.S.C. § 3729(a)(1) .................................................................................................. 9

31 U.S.C. § 3729(b)(3) ................................................................................................ 17

31 U.S.C. § 3730(b)(2) .............................................................................................. 8, 9

31 U.S.C. § 3730(c)(5) ............................................................................. 9, 10, 12, 13

31 U.S.C. § 3730(e)(4)(A) ................................................................................... 12, 16

<u>Regulations</u>

12 C.F.R. Part 30, Appendix C ................................................................................. 13

<u>Other Authorities</u>

S. Rep. No. 99-345 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266 .................................. 9

## PRELIMINARY STATEMENT

The United States of America (the "United States" or the "Government"), by its attorney, Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in opposition to Relator Tamika Miller's Motion for an Award of a *Qui Tam* Relator's Share.  *See* ECF Nos. 21-22 ("Relator Mot.").  Relator is not entitled to a share of the $400 million civil money penalty that the Office of the Comptroller of the Currency ("OCC") imposed on Citibank, N.A. in October 2020, as the culmination of several years of work by the OCC's Citibank examination team to address certain of the Bank's deficiencies through the OCC's supervisory process.  First, as a factual matter, the 2020 civil money penalty was not in any way based on any allegations made, or information provided by, Relator.  Second, Relator has not yet established her entitlement to any relator's share in this ongoing False Claims Act matter.  Last, Relator's *qui tam* complaint does not state a valid False Claims Act claim. Therefore, the Court should deny Relator's motion.

## BACKGROUND

### I.    The OCC's 2015 and 2020 Enforcement Actions Against Citibank

The OCC charters, regulates, and supervises all national banks, federal savings associations, and federal branches and agencies of foreign banks ("regulated institutions").  *See* Declaration of Greg Sullivan dated April 21, 2022 ("OCC Dec."), ¶ 6; *see also* https://occ.gov/topics/laws-and-regulations/index-laws-and-regulations.html (last visited April 22, 2022) ("The OCC is the primary regulator of banks chartered under the National Bank Act (12 U.S.C. § 1 *et seq.*)").  The OCC is responsible for assessing the safety and soundness of regulated institutions and their compliance with applicable laws and regulations, which the OCC accomplishes through targeted reviews and ongoing supervisory activities.  *See* OCC Dec. ¶ 6. The OCC also has the authority to pursue enforcement actions against regulated institutions that

engage in violations of laws or regulations or unsafe or unsound practices. *Id.* ¶ 7; *see* 12 U.S.C. § 1818. Among the types of enforcement actions that the OCC may undertake are Cease and Desist Orders, pursuant to which the OCC may, among other things, require a bank to cease and desist from an unsafe or unsound practice or violation, and Civil Money Penalty Orders, by which the OCC may require a bank to pay a monetary penalty. *See* https://occ.gov/topics/laws-and-regulations/enforcement-actions/enforcement-action-types/index-enforcement-action-types.html (last visited April 22, 2022).

### A. The 2015 Orders and 2018 Termination

Citibank, N.A. ("Citibank") is a regulated institution in the OCC's Large Bank portfolio, which includes banks that hold assets of approximately $50 billion or more. *See* OCC Dec. ¶ 1. In 2015, the OCC issued a Consent Cease and Desist Order (the "2015 Consent Order") and related Consent Order for a Civil Money Penalty (together, the "2015 Orders"), addressing deficiencies in Citibank's (1) billing practices regarding identity protection products, and (2) marketing and sales practices regarding debt cancellation products. *See* OCC Dec. ¶ 8, Exs. A, B.[1] The OCC determined that these deficiencies constituted unfair or deceptive practices under section 5 of the Federal Trade Commission Act. *Id.* ¶ 8, Exs. A, B. More specifically, the OCC found *inter alia* that for a period of time, Citibank billed its customers for identity protection products when those customers were not receiving the full advertised benefits of the products. *See id.*, Ex. A at 2. The OCC also found that Citibank's telemarketing and telesales practices for certain debt cancellation products could have misled reasonable consumers about material information regarding those products, including information about product cost, features, or

---

[1] The 2015 Orders were directed to both Citibank, N.A. and Department Stores National Bank in Sioux Falls, South Dakota. *See* OCC Dec., Exs. A, B.

eligibility requirements.  *Id.* at 3.

The 2015 Consent Order directed Citibank to take a number of actions, including reimbursing Bank customers affected by the deficient practices and instituting new policies and procedures to prevent those practices from continuing.  *See id.* ¶ 8, Ex. A at 4-22.  The related civil money penalty order directed Citibank to pay a $35 million penalty.  *See id.* ¶ 3, Ex. B at 4. Neither of the 2015 Orders provided for an additional mandatory or automatic penalty or fine, if Citibank were to violate any of the terms of either Order.  *See id.*, Exs. A, B.

In 2018, the OCC issued an Order terminating the 2015 Consent Order.  *See id.*, Ex. C (the "2018 Termination").  The 2018 Termination states that "the OCC believes that the safety and soundness of the Bank and its compliance with laws and regulations does not require the continued existence of the [2015 Consent Order]."  *Id.*  The termination resulted from the OCC's verification "that the Bank had adopted, implemented, and adhered to the corrective actions set forth in each of the 2015 Consent Order's actionable articles and validated that the corrective actions were effective and sustainable in addressing the [B]ank's deficiencies."  OCC Dec. ¶ 10.

### B.   The 2020 Orders

In October 2020, the OCC issued a Consent Order (the "2020 Consent Order") and related $400 million civil money penalty assessment (the "2020 CMP" and, together with the 2020 Consent Order, the "2020 Orders") to Citibank, as the culmination of years of Citibank's failure to address certain supervisory concerns identified by OCC examiners assigned to the OCC's Citibank examination team.  *See id.* ¶ 2, Exs. D, E.  Broadly speaking, the 2020 Orders addressed, among other things, a number of unsafe or unsound banking practices relating to Citibank's long-standing failure to establish effective risk management and data governance programs and internal controls.  *Id.* ¶ 18.  Some of the OCC supervisory concerns that were

ultimately addressed in the 2020 Orders dated back several years.  *Id.* ¶¶ 18, 26-27.  The Citibank examination team began discussions in January 2019, regarding the escalation of OCC's various concerns into an enforcement action (which led to the 2020 Orders).  *Id.* ¶ 18.

The unsafe or unsound practices addressed by the 2020 Orders included inadequacies in Citibank's (1) enterprise-wide risk management and compliance risk management program; (2) internal controls; and (3) data quality and data governance, including risk data aggregation and management and regulatory reporting.  *See id.* ¶ 21, Ex. D at 2-3.  The OCC found that these failures contributed to various violations, including violations of the Fair Housing Act, the Flood Disaster Protection Act, and other statutes and regulations.  *Id.* ¶ 21.  The OCC did not find that the failures addressed by the 2020 Orders resulted in unfair or deceptive acts or practices of the type that were addressed by the 2015 Orders; nor was the 2020 CMP assessed based on Citibank's noncompliance with any prior formal enforcement action, including the 2015 Orders. *Id.* ¶¶ 21, 23.

Moreover, the 2020 Orders did not address any identified deficiencies in Citibank's *third-party* risk management practices.  *Id.* ¶¶ 17, 21-22, 26.  In the context of OCC supervision, risk management is a very broad area and refers to policies, processes, personnel, and control systems that banks use to measure, monitor, and control credit, interest rate, liquidity, price, operational, compliance, strategic, and reputation risk.  *Id.* ¶ 22.  The 2020 Orders addressed risk management deficiencies because the OCC concluded that Citibank had deficient policies, processes, personnel, and/or control systems in several of these areas.  *Id.* ¶ 22, Ex. D at 13, 17 (addressing enterprise-wide risk management and compliance risk management).  However, the 2020 Orders did not address third-party risk management, because the OCC did not identify deficiencies in that area.  *Id.* ¶¶ 17, 22.

Both of the 2020 Orders state that "the OCC expects the Bank to expeditiously undertake all necessary and appropriate actions to achieve compliance with this Order," and reserve the OCC's right to take supervisory and/or enforcement actions "in circumstances where the OCC determines that the Bank is not making sufficient and sustainable progress towards achieving compliance with [the Orders]." *Id.*, Ex. D at 32, Ex. E at 6. However, like the 2015 Orders, the 2020 Orders do not provide for any mandatory or automatic penalty or fine if Citibank violates any of the terms of either Order. *See id.*, Exs. D, E. The 2020 Orders also provide that "[t]he OCC releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the OCC based on the practices and violations described in Article II of [the Orders]," *see id.*, Ex. D at 31-32, Ex. E at 6; but the 2020 Orders make clear that they do not contain any "release, discharge, compromise, settlement, dismissal, or resolution of any actions, or in any way affect[] any actions that may or have been brought by any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice." *Id.* at 33; *see also id.*, Ex. E at 7.

## II.    Relator's Complaint to OCC

Relator Tamika Miller works in the Consumer Third-Party Risk Oversight Department at Citibank (known prior to March 2020 as the Third-Party Risk Management Department), where she has worked since May 2014. *See* Declaration of Tamika Miller dated January 31, 2022 (ECF No. 21-1) ("Relator Dec."), ¶ 7. In July 2019, Relator filed an anonymous complaint with the OCC's Customer Assistance Group ("CAG"). *See* OCC Dec. ¶ 11. In her complaint to the OCC (hereafter, Relator's "CAG Complaint"), Relator alleged that Citibank employees, including managers in third-party risk management: (1) suppressed audit findings related to compliance with third-party service supplier agreements, (2) failed to follow policies and procedures in

conducting audits of third-party service supplier agreements, and (3) over-rode Citibank's third-party risk management repository system so as to produce more favorable audit findings. *See id.* ¶ 12. Relator's CAG Complaint also alleged that Citibank's third-party risk management organizational structure created a conflict of interest, as third-party risk auditors reported directly to Citibank officers who were also responsible for monitoring and managing the third-party suppliers. *Id.* Finally, the CAG Complaint alleged that Citibank retaliated against Relator for reporting her concerns internally. *Id.*

The OCC handled Relator's CAG Complaint in accordance with its internal procedures. *Id.* ¶ 14. CAG forwarded the CAG Complaint to OCC Enforcement and to an OCC examiner assigned to Citibank. *Id.* ¶ 11. In August 2019, Relator, through counsel, provided the OCC with unredacted versions of documents Relator had submitted with her CAG complaint, and that information was reviewed by OCC examiners and attorneys. *Id.* ¶¶ 11, 14. In September 2021, OCC examiners and attorneys interviewed Relator. *Id.* ¶¶ 11, 14. Because Relator's CAG Complaint addressed third-party risk management, an OCC examiner familiar with Citibank's third-party risk management area also participated in Relator's interview. *Id.* ¶ 14. The examiners also collected and reviewed additional information regarding Citibank's third-party risk management. *Id.* Critically, the workstream within the OCC that encompassed the OCC's review of Relator's CAG Complaint (hereafter, the "CAG Workstream") was separate and distinct from the then-already ongoing OCC workstream that was handling and discussing the supervisory concerns ultimately addressed in the 2020 Orders (hereafter, the "Enforcement Workstream").[2] *See id.* ¶¶ 14, 19, 28.

---

[2] The Enforcement Workstream involved close coordination between certain examiners on the OCC Citibank examination team and the OCC Law Department to determine and recommend

### III.   Relator's *Qui Tam* Lawsuit and the Government's Investigation

In November 2019, Relator filed the present *qui tam* lawsuit under seal, alleging the same

practices described in her CAG Complaint and asserting that the defendants (various Citibank

entities) violated the False Claims Act (the "FCA"), as amended, 31 U.S.C. § 3729 *et seq.*, and

the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12

U.S.C. § 1833a.  *See* ECF No. 9 (hereafter, Relator's "*Qui Tam* Complaint").  The FCA imposes

civil liability on persons who knowingly submit to the federal government false or fraudulent

claims for payment.  *See* 31 U.S.C. § 3729.  An action under the FCA may be commenced either

by the Government, *see id.* § 3730(a), or by a private person—known as a relator—who

maintains the action "in the name of the Government."  *Id.* § 3730(b)(1).  Suits brought by

relators on behalf of

the Government are known as *qui tam* suits.

Relator's *Qui Tam* Complaint advances two theories of liability under the FCA: first, that

Citibank violated the 2015 Orders (and a 2015 Consent Order with the Consumer Financial

Protection Bureau ("CFPB")), thereby "subject[ing] Defendants to civil money penalties," *see*

*Qui Tam* Complaint ¶¶ 63-66; and second, that the allegedly deficient third-party risk

management practices that Relator observed in her department "allow[ed] Defendants to defraud

the Government."  *See id.* ¶¶ 67-99.  The *Qui Tam* Complaint asserts that Defendants therefore

made "reverse" false claims to the Government (improperly avoiding an obligation to pay or

transmit money or property to the Government), *id.* ¶¶ 104-116; knowingly made or used false

records or statements to avoid fines and penalties due to the Government, *id.* ¶¶ 117-126; and

_____

the appropriate enforcement actions to address the OCC's longstanding supervisory concerns
about Citibank.  OCC Dec. ¶ 19.  These efforts also involved the development and drafting of
the specific provisions contained in the 2020 Consent Order.  *Id.*

conspired to defraud the Government, *id.* ¶¶ 127-138.

After Relator filed the *Qui Tam* Complaint, the Department of Justice ("DOJ") commenced

an investigation of her allegations.  The Government may choose to intervene in a *qui tam* suit or

declined to intervene.  *See* 31 U.S.C. § 3730(b)(2).  If the Government declines to intervene, the

relator "shall have the right to conduct the action."  *Id.* § 3730(b)(4)(B).[3]  In June 2020, the

Government declined to intervene in and adopt the prosecution of Relator's FCA claims.  *See*

ECF No. 11.  After concluding the rest of its inquiry (into potential FIRREA violations[4]), the

Government submitted a proposed unsealing order to the Court, and this matter was unsealed.

*See* ECF No. 7.  Relator elected not to voluntarily dismiss the *Qui Tam* Complaint, but rather to

serve the *qui tam* defendants with the complaint and pursue the action.  *See* ECF No. 17.

Citibank has filed a motion to dismiss the *Qui Tam* Complaint.  *See* ECF Nos. 37-39.

DOJ alerted the OCC to the *Qui Tam* Complaint after it was filed.  *See* OCC Dec. ¶ 15.  As

part of its review of Relator's allegations made in the CAG Complaint and the *Qui Tam*

Complaint, OCC staff attended an interview of Relator conducted by an Assistant United States

Attorney in March 2020.  *Id.*  The OCC never concluded that the allegations in Relator's CAG

Complaint and *Qui Tam* Complaint were substantiated, either through the OCC's review of the

specific information that Relator provided in connection with those Complaints, or through the

OCC's normal-course supervision of Citibank's third-party risk management practices.  *See id.*

---

[3] Even where the Government declines to intervene in an FCA suit, however, the Government
remains the real party in interest in the suit.  *See, e.g.*, *United States ex rel. Kreindler &
Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154 (2d Cir. 1993).

[4] If the Government had elected to pursue some or all of Relator's allegations under a FIRREA
theory, which it has not done, it would have filed a complaint on behalf of the United States
stating a cause or causes of action under FIRREA.  Relator's FIRREA claims are irrelevant to
the present motion, since—as explained below—the only claims that may potentially entitle a *qui
tam* relator to a share under the FCA's "alternate remedy" provision are, naturally, FCA claims.

¶¶ 5, 16, 25.  In addition, the information that Relator provided and that the OCC reviewed within the context of the CAG Workstream did not impact the OCC's Enforcement Workstream, or alter the OCC's supervisory process that culminated in the 2020 Orders.  *See id.* ¶ 28.  For these reasons, and because the 2020 Orders did not address any aspect of Citibank's third-party risk management practices, *see id.* ¶¶ 17, 21-22, 26, the 2020 Orders were not based on or related to Relator's allegations in the CAG Complaint and the *Qui Tam* Complaint.  *See id.* ¶¶ 4, 17, 20-21, 28.

## ARGUMENT

### I.    The FCA's Alternate Remedy Provision

Persons who violate the FCA are liable to the United States for statutory penalties and treble damages.  *See* 31 U.S.C. § 3729(a)(1).  A qualified relator in a successful *qui tam* suit is entitled to a share of the proceeds (if any) of the suit or settlement of the claims.  *Id.* § 3730(d). If the Government intervenes, the relator's share generally must be between fifteen and twenty-five percent of the proceeds.  *Id.* § 3730(d)(1).  If the Government does not intervene, the relator's share generally must be between twenty-five and thirty percent of the proceeds, depending on what "the court decides is reasonable."  *Id.* § 3730(d)(2).

The FCA recognizes the Government's authority to pursue other remedies for fraud even after a relator has filed a *qui tam* suit.  The alternate remedy provision of the FCA states that "the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty."  31 U.S.C. § 3730(c)(5).  Congress enacted this provision to afford the United States flexibility in choosing the forum in which it pursues its claims against persons who defraud the Government. *See* S. Rep. No. 99-345, at 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5292.  The

provision authorizes the Government to pursue its fraud claims against defendants

administratively rather than through a relator's *qui tam* suit, and specifies that, if the Government

elects to pursue an alternate remedy, the relator "shall have the same rights in such proceeding as

such person would have had if the action had continued under this section."  31 U.S.C. §

3730(c)(5); *see also, e.g.*, *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1010

(9th Cir. 2001) ("the relator has a right to recover a share of the proceeds of the 'alternate

remedy' to the same degree that he or she would have been entitled to a share of the proceeds" of

the FCA suit).  The alternate

remedy provision "preserves the rights of the original qui tam plaintiffs when the government

resorts to an alternate remedy in place of the original action."  *United States ex rel. LaCorte v.*

*Wagner*, 185 F.3d 188, 191 (4th Cir. 1999).

## II.      Relator Is Not Entitled to a Share of the 2020 CMP

In her motion, Relator claims that: (1) the 2020 CMP that the OCC imposed on Citibank

represented an "alternate remedy" that the Government pursued as a means of redressing the

alleged fraud described in Relator's *Qui Tam* Complaint; and (2) Relator is therefore entitled to a

relator's share of the $400 million 2020 CMP.  *See* Relator Mot. at 1-5.  Relator again refers in

her motion to her allegations regarding supposed deficiencies within her third-party risk

management department at Citibank, *e.g.*, *id.* at 1, 22-23, but appears to rely primarily on a

theory that Citibank violated the 2015 Orders; concealed its violations from the OCC, thereby

avoiding obligations to pay fines or penalties; and therefore made reverse false claims on the

Government.  *See, e.g.*, 4-5.  Relator contends "[u]pon information and belief" that the OCC's

2020 enforcement actions against Citibank were, "in part, based on evidence provided by Relator." *Id.* at 2.[5]

Relator is wrong for a number of reasons.  First, the 2020 Orders, including the 2020 CMP, were not based on, nor did they address, any of Relator's allegations or the information she provided in connection with her CAG Complaint or *Qui Tam* Complaint.  Therefore, the 2020 Orders were not the Government's alternate remedy for Relator's *qui tam* claims.  Second, because her *qui tam* matter is still proceeding (and none of the *qui tam* defendants have yet been determined to be liable on any of Relator's FCA claims), Relator has not established even any potential entitlement to a relator's share in this case.  Third, Relator's *Qui Tam* Complaint does not state a valid claim under the FCA.  For these reasons, the Court should deny Relator's motion.

> **A.    The 2020 Orders Were Not the Government's Alternate Remedy For Redressing Relator's *Qui Tam* Allegations**

First, as a purely factual matter—and as explained in the OCC declaration provided by Greg Sullivan (the OCC Examiner-in-Charge at Citibank from September 2015 to December 2020, *see* OCC Dec. ¶¶ 1-2)—the 2020 Orders were not based on and did not address any information provided by Relator in connection with her CAG Complaint or *Qui Tam* Complaint; did not address any of Citibank's third-party risk management practices at all; and were not based on Citibank's noncompliance with any prior formal, public enforcement action, including

---

[5] Relator's Motion also refers numerous times to Citibank's supposed violations of a 2015 Consent Decree entered into by Citibank and the CFPB. *See, e.g.*, Relator Mot. at 1-2, 4-8. However, the relevance of any CFPB Consent Decree to Relator's Motion is wholly unclear, since Relator points only to the OCC 2020 CMP as a supposed alternate remedy of which Relator believes she is entitled to a share. *See, e.g.*, *id.* at 23-24.  Furthermore, in describing her reverse false claims theory, Relator discusses only Citibank's supposed liability to the OCC. *See id.* at 14-17.

the 2015 Orders (which OCC itself terminated in 2018).  *See supra* Parts I.A-B, III

(Background); *see* OCC Dec. ¶¶ 4, 10, 17, 20-23, 28.  Because there is no overlap between the

allegations in Relator's *Qui Tam* Complaint and the bases for the 2020 Orders, the 2020 CMP

simply did not constitute an alternate remedy of which Relator may be entitled to a share.

      A relator may recover from an alternate remedy only to the extent that the alternate

remedy "overlaps" with the *qui tam* action.  *See, e.g.*, *United States ex rel. Bledsoe v. Cmty.*

*Health Sys., Inc.*, 501 F.3d 493, 522 (6th Cir. 2007); *Rille v. PriceWaterhouseCoopers LLP*,

803 F.3d 368, 373 (8th Cir. 2015) (*en banc*).  Here, there is no overlap between Relator's

allegations and the bases for the 2020 Orders.  This gap is confirmed by the declaration

submitted by Mr. Sullivan, who "was personally involved in determining the supervisory

concerns that were escalated into and addressed by the 2020 Orders."  OCC Dec. ¶ 4; *see also id.*

¶ 20 ("I was personally involved in determining the supervisory concerns to be escalated into the

2020 Consent Order and addressed by the 2020 CMP Order.").  As Mr. Sullivan states, "[n]one

of these concerns were based on or addressed any of the allegations made, or the information

provided, by Relator in her CAG Complaint or *Qui Tam* Complaint."  *Id.* ¶ 20.

      In addition, the concerns addressed in the 2020 Orders were not "of the *type* that could

have been pressed under the [FCA]."  *United States v. Novo A/S*, 5 F.4th 47, 54 (D.C. Cir. 2021)

(emphasis added).  Generally, only those proceedings designed to pursue allegations of fraud

against the Government can qualify as an alternate remedy for purposes of 31 U.S.C. §

3730(c)(5).  *Cf. Barajas*, 258 F.3d at 1011, 1012 (recognizing that an administrative debarment

proceeding would "rarely" be an alternate remedy but concluding that it was where it

"substantially replicated the remedy [the government] could have obtained" in the relator's *qui*

*tam* action).  As the D.C. Circuit opined in *Novo A/S*:

> [T]he text of the alternate-remedy provision establishes that the alternative remedial proceedings from which a relator can recover a share must redress the same type of falsity and fraud claims that otherwise could be pursued by a private relator's *qui tam* lawsuit under the [FCA].  That could include, for example, an administrative proceeding for the remediation of false or fraudulent money claims.  *See* 31 U.S.C. § 3730(c)(5).  By the same token, if the alternate proceeding seeks recompense for some other type of claim that the relator could not have brought, then the proceeding is not covered by subsection 3730(c)(5) because it is not "alternate" to the False Claims Act *qui tam* remedy.  It is a different legal claim altogether, arising beyond the False Claims Act's borders.

*Novo A/S*, 5 F.4th at 56.

The 2020 Orders could not have been a substitute for Relator's claims under the FCA because the 2020 Orders were not based on, nor did they address, any false or fraudulent claim for payment made to the Government by Citibank, or Citibank's improper avoidance of any obligation to pay or transmit money or property to the Government.  *See* OCC Dec. ¶ 24.  The 2020 Orders addressed certain unsafe or unsound banking practices, as well as Citibank's noncompliance with 12 C.F.R. Part 30, Appendix D (the OCC's regulations establishing heightened standards for certain large insured national banks and other institutions).  *See* OCC Dec. ¶¶ 18, 21.  Relator could not have brought a *qui tam* lawsuit against Citibank simply for unsafe or unsound banking practices, or for noncompliance with the OCC's regulations, absent some allegations of false claims or reverse false claims made to the Government.  *Cf. Novo A/S*, 5 F.4th at 56-57 (noting that the relator in that case could not have brought a *qui tam* lawsuit based on misbranding, and the Government's settlement of a misbranding claim therefore "did not resolve the type of claim that could have been litigated under the" FCA and did not constitute an alternate remedy).  For this additional reason, the 2020 Orders did not constitute the Government's alternate remedy to redress any of Relator's FCA allegations.  *See* OCC Dec. ¶ 28 ("[T]he 2020 Orders did not reflect the OCC's pursuit or resolution of any of Relator's claims set forth in either her CAG Complaint or *Qui Tam* Complaint."); *see also id.* ¶ 5.

Moreover, the 2020 Orders were "the culmination of discussions and work within OCC that long predated the OCC's receipt of Relator's Complaints in 2019." *Id.* ¶ 26.  Many of the supervisory concerns addressed by the 2020 Orders were identified by the OCC and communicated to Citibank several years prior to Relator's CAG and *Qui Tam* Complaints.  *Id.* ¶ 27.  Indeed, the OCC's Citibank examination team had begun discussions in January 2019, regarding the escalation of certain supervisory concerns into an enforcement action.  *Id.* ¶ 18. Even though some of the concerns addressed by the 2020 Orders were identified and conveyed to Citibank close in time to or after the point at which OCC became aware of Relator's allegations, these concerns were identified through the OCC's ongoing supervisory process and were not based on or related to Relator's allegations or the information provided by Relator.  *Id.* ¶ 27.  Although not dispositive of the issue (because Relator's *qui tam* was pending at the time the OCC issued the 2020 Orders), the ongoing and long-standing nature of the OCC's examination work that culminated in the 2020 Orders strongly supports the conclusion that the 2020 Orders were not simply an alternate remedy that the Government elected to pursue to redress Relator's claims.  *See, e.g.*, *Guardiola ex rel. United States v. United States*, 845 F. App'x 707, 708 (9th Cir. 2021) (reversing district court order determining that Government audits constituted an alternate remedy to redress *qui tam* claims, because the Government had been continuously auditing the target for false billing from 2010 to 2013, and the relator filed her *qui tam* complaint in 2012, describing the same misconduct); *id.* ("[i]f the government chooses to recoup lost dollars in a proceeding *before* the relator files her *qui tam* complaint, that proceeding does not constitute an alternate remedy") (emphasis added); *see also Barajas*, 258 F.3d at 1010 ("An alternate remedy . . . is a remedy achieved through the government's pursuit of a claim *after* it has chosen not to intervene in a *qui tam* relator's [] action.") (emphasis added); *cf. United*

*States ex rel. Ubl v. United States*, Nos. 1:97 MC 117, 1:99 MC 81, 2006 WL 1050650, at *3-4

(E.D. Va. Apr. 18, 2006) (relator was not entitled to share of recovery where audits had largely

preceded *qui tam* action "and so for the majority of the relevant time period, it is utterly

impossible that the recommended . . . measures were at all traceable to Relator's complaint"),

*aff'd on other grounds sub nom. Ubl v. Savin Corp.*, 217 F. App'x 237 (4th Cir. 2007).

      Against this backdrop, Relator's reliance on sealed cover letters that the Government

submitted to the Court during DOJ's investigation of the allegations in the *Qui Tam* Complaint is

wholly misplaced. *See* ECF Nos. 22-3, 22-4, 22-5, 22-6, 22-7. According to its normal practice

in sealed *qui tam* proceedings, the Government simply provided periodic updates to the Court

regarding its ongoing investigation as well as the agencies' continuing review of Relator's

allegations, along with the Government's requests for extensions of the seal and other ministerial

submissions. *See id.* Nothing in these sealed exhibits contradicts the fact that for a multitude of

reasons, the 2020 Orders did not constitute an alternate remedy that the Government elected to

redress any allegations made by Relator.

### B. Relator Has Not Established an Entitlement to Any Relator's Share Because Her *Qui Tam* Lawsuit Is Pending and There Has Been No Finding of FCA Liability

      Next, Relator's motion for an FCA relator's share is premature, given that Relator's FCA

lawsuit is still proceeding, and the defendants have not been found liable on any of Relator's

FCA claims. In fact, Citibank has moved to dismiss the complaint. *See* ECF Nos. 37-39. A

relator may recover from an alternate remedy only insofar as the relator has a valid *qui tam*

action, which is a question still to be resolved in this lawsuit. *See, e.g.*, *United States ex rel.*

*Hefner v. Hackensack Univ. Med. Cent.*, 495 F.3d 103, 112 (3d Cir. 2007) ("a valid *qui tam*

action is a prerequisite to a relator's right to recover"). Before Relator may recover a share, the

Court must determine whether she has established by a preponderance of the evidence that the defendants defrauded the United States in violation of the FCA as alleged in Relator's *Qui Tam* Complaint.  Assuming Relator's suit succeeds, the Court must then assess the total penalties and damages that may be recovered from the defendants, *see* 31 U.S.C. § 3729(a).  The Court must finally determine Relator's share of any recovery, to be paid out of the proceeds of the action, based on what "the court decides is reasonable."  *Id.* § 3730(d)(2).  Only after the Court resolves those questions and enters final judgment for Relator will her entitlement to a share of the FCA judgment—and if applicable, any alternate remedy—be established.  Relator's attempt to claim a share now would short-circuit the process mandated by Congress for establishing liability under the FCA and calculating any share to which she may later be entitled.

Relator asserts in her motion, without explanation, that although her FCA "claim is still pending today," it "ultimately is precluded by the alternate remedy."  Relator Mot. at 14. Nothing has precluded Relator's *qui tam* action from proceeding, and the FCA claims that Relator asserts on behalf of the United States have not been released.  Although Citibank acknowledges in its motion to dismiss the *Qui Tam* Complaint that the 2020 Orders were "not based upon [Relator's] allegations," ECF No. 39 at 2, it nevertheless incorrectly asserts that the 2020 Consent Order "bars" Relator's FCA claims, *id*. at 18, pointing to the provision in the 2020 Consent Order pursuant to which "[t]he *OCC* releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted *by the OCC based on the practices and violations described in Article II of [the Orders]*."  *See* OCC Dec., Ex. D at 31-32 (emphases added).  As noted above, though, the 2020 Orders make clear that they do not contain any "release, discharge, compromise, settlement, dismissal, or resolution of any actions, or in any way affect[] any actions that may or have been brought by any other representative *of*

*the United States* or an agency thereof, including, without limitation, *the United States Department of Justice*." *Id.* at 33 (emphases added); *see also id.*, Ex. E at 7. The 2020 Orders therefore do not release or preclude FCA claims brought by or on behalf of the United States based on any conduct, including conduct not covered by the 2020 Orders or alleged false claims or reverse false claims by Citibank to the Government. *See* OCC Dec. ¶ 24 (confirming that the 2020 Orders were not based on, nor did they address, false claims or reverse false claims made to the Government).

Therefore, Relator's motion should be denied for the additional reason that Relator's *qui tam* action is proceeding, and she has not yet established any entitlement to a relator's share of any potential recovery therein.

### C.      Relator's *Qui* Tam Complaint Does Not State a Valid FCA Claim

Finally, as set forth above, a relator must maintain a valid FCA action in order to be entitled to a share of any ultimate FCA recovery. Relator's allegations as pled in the *Qui Tam* Complaint rely on a theory that Citibank made reverse false claims to the Government by improperly avoiding an obligation to pay regulatory fines or penalties associated with either its supposed noncompliance with the 2015 Orders, or with allegedly deficient third-party risk management practices that Relator observed. *See supra* Part III (describing the claims in the *Qui Tam* Complaint). Relator's theory fails.[6]

A reverse false claim can only arise from "an established duty" to "pay or transmit money . . . to the Government." 31 U.S.C. §§ 3729(a)(1)(G), (b)(3). The *Qui Tam* Complaint identifies no such "established duty." With respect to the theory in the *Qui Tam* Complaint that

---

[6] The Government reserves its right under 31 U.S.C. § 3730(c)(2)(A) to dismiss the Relator's *qui tam* action.

Citibank incurred an obligation to pay money to the Government by violating the 2015 Consent Order, even if that were correct, that Order does not set forth any mandatory or automatic fines or penalties that Citibank would have a duty to pay as a result of any such violation. *See id.*, Ex. A. Rather, the 2015 Consent Order preserves the OCC's discretion and entitlement to undertake certain actions affecting Citibank, including potentially instituting other enforcement actions. *See id.*, Ex. A at 23-24. An unassessed *potential* penalty does not qualify as an "established duty" to pay that can give rise to a reverse false claim. *See, e.g.*, *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 725 (D.C. Cir. 2019).

The same analysis applies to Relator's allegations in the *Qui Tam* Complaint—on which Relator does not seem principally to rely in her Motion for a Relator's Share—that Citibank's supposedly deficient third-party risk management practices gave rise to some type of false claims or reverse false claims on the Government. In describing the alleged practices that she observed, Relator falls far short of identifying "an established duty" to "pay or transmit money or property . . . to the Government" arising at the time and as a result of the supposed deficiencies. Instead, the *Qui Tam* Complaint alleges vaguely that "Defendants are obligated to comply with the rules and regulations set forth in various Federal Agency Guidelines," *Qui Tam* Complaint ¶ 14, or that Citibank's practices "allow[ed] Defendants to defraud the Government." *Id.* ¶ 99. For liability to attach, there must be an established duty to pay money and, in the enforcement context, where the Government has not, in fact, assessed penalties, there is no such duty. *See, e.g.*, *United States ex rel. Simoneaux v. E.I. DuPont de Nemours & Co.*, 843 F.3d 1033, 1039-40 (5th Cir. 2016) (contrasting unassessed penalties with customs duties and noting that "the customs law imposes a duty to *pay*"); *BASF*, 929 F.3d at 725-26. As to Relator's allegations relating to third-party risk management practices, Citibank has only an obligation to obey the

law, and Relator has identified no required obligation to pay a penalty to the Government for a violation of the law before one is imposed.

For the purpose of adjudicating the present motion, of course, the Court need not even grapple with issues relating to unassessed potential penalties, because Relator has pointed to the exact penalty of which she believes she is currently entitled to a share—the $400 million 2020 CMP, which Relator insists must have been based at least in part on her allegations in the *Qui Tam* Complaint by virtue of the fact that the CMP was assessed after the Complaint was filed. But as discussed at length above, Relator fails to establish any factual connection or overlap between Citibank's violations as alleged in the *Qui Tam* Complaint, and the 2020 CMP that—per Relator's theory—represents the Government's alternate remedy to redress Citibank's supposed reverse false claims. The OCC's declaration makes clear that the 2020 CMP was not based on any noncompliance by Citibank with a prior formal enforcement action, including the 2015 Orders. *See* OCC Dec. ¶ 23. Indeed, in 2018, the OCC terminated the 2015 Consent Order based on the OCC's verification "that the Bank had adopted, implemented, and adhered to the corrective actions set forth in each of the 2015 Consent Order's actionable articles and validated that the corrective actions were effective and sustainable in addressing the [B]ank's deficiencies." *Id.* ¶ 10, Ex. C. Nor was the 2020 CMP based on any other allegations made or information provided by Relator. Therefore, there is no overlap between Relator's allegations and the bases for the 2020 CMP, and Relator is thus not entitled to a share of that penalty.

## CONCLUSION

For the foregoing reasons, the Court should deny Relator's motion.

Dated:    New York, New York
           April 22, 2022

                                        Respectfully submitted,

                                      DAMIAN WILLIAMS
                                      United States Attorney for the
                                      Southern District of New York

                              By: _/s/ Rebecca S. Tinio_____
                                      REBECCA S. TINIO
                                      Assistant United States Attorney
                                      86 Chambers Street, Third Floor
                                      New York, New York 10007
                                      Tel.: (212) 637-2774
                                      Fax: (212) 637-2686
                                      Email: rebecca.tinio@usdoj.gov