VALLI KANE & VAGNINI LLP
600 OLD COUNTRY ROAD, SUITE 519
GARDEN CITY, NEW YORK 11530
(516) 203-7180

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | | |
| TAMIKA MILLER, and | ) | |
| TAMIKA MILLER individually, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| | ) | 19-cv-10970-DLC |
| v. | ) | |
| | ) | |
| | ) | |
| CITIGROUP INC., CITIBANK, N.A., | ) | |
| CITIBANK INC., DOE CORPORATIONS 1-10 | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

_____

## REPLY IN FURTHER SUPPORT OF MOTION FOR
## AN AWARD OF A *QUI TAM* RELATOR'S SHARE

## (FILED VIA ECF)

## **<u>TABLE OF CONTENTS</u>**

I.   The 2020 Consent Order Encompasses and Resolves Relator's *Qui Tam* Claim .................. 2

II.  Relator's Entitlement to a Relator's Share Does Not Depend on a Final Judgment of
     Citibank's FCA Liability ....................................................................................... 12

III. Relator Pled a Viable Reverse False Claim Allegation ....................................... 17

CONCLUSION........................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States ex rel. Alderson v. Samsung Elecs. Am., Inc.*,
116 F.Supp. 2d 1323 (M.D. Fla. 2001) ................................................................2

*United States ex rel. Babalola v. Sharma*,
746 F.3d 157 (5th Cir. 2014) ............................................................................12

*United States ex rel. Barajas v. United States*,
258 F.3d 1004 (9th Cir. 2001) ..............................................................10, 13, 16

*United States ex rel. Bledsoe v. Cmty. Health Sys.*,
342 F.3d 634 (6th Cir. 2003) ..................................................................... *passim*

*United States ex rel. Boise v. Cephalon, Inc.*,
2015 U.S. Dist. LEXIS 94448 (E.D. Pa. July 21, 2015)......................................20

*United States ex rel. Burke v. St. Jude Med., Inc.*,
2021 U.S. Dist. LEXIS 247381 (D. Md. Dec. 29, 2021)........................................2

*United States ex rel. Chiba v. Guntersville Breathables, Inc.*,
421 F.Supp. 3d 1241 (N.D. Ala. 2019)..............................................................11

*United States ex rel. FDSI v. Bisig*,
2005 U.S. Dist. LEXIS 38316 (S.D. Ind. Dec. 21, 2005)................................10, 13

*United States ex rel. Gale v. Omnicare, Inc.*,
2013 U.S. Dist. LEXIS 102658 (N.D. Ohio July 23, 2013) ..................................1

*United States ex rel. Kasowitz v. Benson Torres LLP v. BASF Corp.*,
929 F.3d 721 (D.C. Cir. 2019) ...........................................................................18

*United States ex rel. Kennedy v. Novo A/S*,
5 F.4th 47 (D.C. Cir. 2021)......................................................................9, 10, 14

*United States ex rel. Lee v. Northern Adult Daily Health Care Ctr.*,
174 F.Supp. 3d 696 (E.D.N.Y. 2016) ................................................................12

*Rille v. PricewaterhouseCoopers LLP*,
803 F.3d 368 (8th Cir. 2015) .......................................................................7, 16

*United States ex rel. Ruscher v. Omnicare, Inc.*,
2014 U.S. Dist. LEXIS 123831 (S.D. Tex. Sept. 5, 2014) ...................................20

ii

*United States ex rel. Shea v. Verizon Communs., Inc.*,
   844 F.Supp. 2d 78 (D.D.C. 2012) .................................................................2

*United States ex rel. Simoneaux v. E.I. DuPont de Nemours & Co.*,
   843 F.3d 1033 (5th Cir. 2016) ...........................................................18, 19

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
   41 F.3d 1032 (6th Cir. 1994) .................................................................1

**Statutes**

31 U.S.C. § 3730(c) ...........................................................................13

31 U.S.C. § 3730(c)(2)(A) ................................................................7, 8

31 U.S.C. §3730(c)(5) ...................................................................13, 16

31 U.S.C. § 3730(d)(1) .....................................................................13

31 U.S.C. § 3730(d)(1) and (2) ...........................................................2

31 U.S.C. § 3730 (d)(2) .......................................................................3

42 U.S.C. § 4012(a)(f) .........................................................................6

False Claims Act ...................................................................9, 13, 14, 20

Federal Trade Commission Act Section 5 ..........................................3

Flood Disaster Protection Act .............................................................6

**Other Authorities**

12 C.F.R. § 22.7(a) ...............................................................................6

132 Cong. Rec. H-9382 (Daily Ed. Oct. 7, 1986, Statement, R. Berman) .......................2

155 Cong. Rec. No. 82 .......................................................................19

2015 OCC Consent Order ......................................................... *passim*

https://occ.gov/static/enforcement-actions/ea2020-001.pdf
   (last visited May 20, 2022) .................................................................6

October 2020 OCC Consent Order ......................................... *passim*

Sen. Rep. No. 111-10 (2009),
   *reprinted in* 2009 U.S.C.C.A.N. 430 ..............................................19

The United States[1] brief in opposition to Relator's motion for a relator's share (Dkt. #50) ("U.S.

Opp.") is based on multiple mischaracterizations of the applicable law and the pertinent facts –

all designed to distract the Court from the two fundamental questions at issue: (1) Does Relator's

complaint – which was pending when the OCC imposed the $400 million sanction against

Defendant – allege a viable *qui tam* claim under the False Claims Act?; and (2) Does the OCC's

October 2020 sanction resolve any of Defendant's liability alleged in Relator's *qui tam*

complaint, and thus impede Relator's ability to pursue her reverse false claim allegation? In

response to Relator's brief in support of her motion for relator's share (Dkt. #21) ("Rel. Mot."),

the United States contends that:

> Relator is wrong for a number of reasons. First, the 2020 Orders,
> including the 2020 CMP, were not based on, nor did they address,
> any of Relator's allegations or the information she provided in
> connection with her CAG Complaint or *Qui Tam* Complaint.
> Therefore, the 2020 Orders were not the Government's alternate
> remedy for Relator's *qui tam* claims. Second, because her *qui tam*
> matter is still proceeding (and none of the *qui tam* defendants have
> yet been determined to be liable any of Relator's FCA claims),
> Relator has not established even any potential entitlement to a
> relator's share in this case. Third, Relator's *Qui Tam* Complaint
> does not state a valid claim under the FCA.

---

[1] Although Citibank, N.A. also opposed Relator's motion (Dkt. # 52) ("Def. Opp.") – and generally repeated arguments raised in its Motion to Dismiss (Dkt. # 39) or recited the arguments in the United States' Opposition – Defendant has no standing to challenge Relator's entitlement to a reward, as this dispute is solely between Relator and the United States. *See, e.g.*, *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1045-46 (6th Cir. 1994) (finding that when a district court was asked to resolve a dispute over a successful relators' award, the court properly "excluded [the defendant], over its objection, from participating as a party to the action, because the company had no financial interest in the outcome of the Relators'-Share Litigation." The circuit court held that "[a]lthough [the defendant] eagerly assisted in the government's efforts to reduce the relators' bounty, [the defendant]'s role was comparatively peripheral. It had **no legal standing or right to participate** in the proceedings," and thus, was not liable to the relator for costs and attorneys' fees associated with that dispute.) (emphasis added); *United States ex rel. Gale v. Omnicare, Inc.*, 2013 U.S. Dist. LEXIS 102658, at *1, 31-32 (N.D. Ohio July 23, 2013) (rejecting defendant's argument that a successful relator's award should be reduced due to "unclean hands," and instead finding that "[s]hould [the relator] make any recovery, the United States would have standing to assert that [the relator]'s share of the award should be reduced. But this would be a matter between [the relator] and the United States. It would not concern [the defendant], although [the defendant] would, of course, be free to assist the government").

U.S. Opp. at 11; *see also id.* at 1.  Each of these arguments will be addressed in turn.

## I.   The 2020 Consent Order Encompasses and Resolves Relator's *Qui Tam* Claim

The United States asserts that the October 2020 OCC consent order and corresponding

OCC sanction "was not in any way based on any allegations made, or information provided by,

Relator."  U.S. Opp. at 2; *see also id.* at 9, 11, 13.  As an initial matter, Relator cannot know the

extent to which the 2020 consent order and corresponding sanction was "based on" her

allegations – or even what the United States means by that ambiguous phrase.  But those

questions are not presently before the Court, which has merely been asked to determine Relator's

*entitlement* to a relator's share – not the amount of the reward she is due.   It is well-settled that a

relator's entitlement to a share of the Government's recovery arises when the relator files a

viable *qui tam* lawsuit that is resolved by a subsequent financial recovery for the United States –

whether through the FCA framework or otherwise.  In fact, the 15% minimum[2] relator's reward

has historically been referred to as a "finder's fee" that is paid to a relator "even if that person

does nothing more than file the action in federal court."  *See*, *e.g.*, *United States ex rel. Burke v.*

*St. Jude Med., Inc.*, 2021 U.S. Dist. LEXIS 247381, at *11-12 (D. Md. Dec. 29, 2021); *United*

*States ex rel. Shea v. Verizon Communs., Inc.*, 844 F.Supp. 2d 78, 81 (D.D.C. 2012) (citing 132

Cong. Rec. H-9382 (Daily Ed. Oct. 7, 1986, Statement, R. Berman); *United States ex rel.*

*Alderson v. Samsung Elecs. Am., Inc.*, 116 F.Supp. 2d 1323, 1332 n.29 (M.D. Fla. 2001) (same).

Thus, the Court need not determine at this time whether the Government's alternate remedy was

---

[2] Since the Government declined to intervene, the minimum percentage due to Relator – *i.e*., the "same rights" Relator would have in the *qui tam* suit – is 25% of the Government's recovery that encompasses her claim.  *See* 31 U.S.C. § 3730(d)(1) and (2).

"based on" Relator's complaints.[3]  Again, the relevant inquiry before the Court is whether

Relator had a pending, valid *qui tam* action that was resolved by the 2020 OCC sanction.  If the

OCC sanction has the legal consequence of precluding an allegation that was pending in

Relator's *qui tam* lawsuit, then Relator is entitled to a fair share of that sanction as her reward.

The United States' assertions that the OCC sanction was not "based upon" Relator's FCA

allegations is nothing more than a red herring.

The Government also claims that the October 2020 OCC consent order does not

"address" Relator's reverse false claim allegation, *see*, *e.g.*, U.S. Opp. at 1, 9, 11-13 – another

ambiguous term that avoids any definitive statement regarding whether the 2020 OCC consent

order and sanction actually impairs Relator's ability to proceed with her *qui tam* suit.  The

consent order need not specifically "address" Relator's fraud claims to have preclusive effect.

As Relator's Declaration in Support of her Motion (Dkt. #21-1) ("Rel. Dec.") makes clear, the

issues resolved by the October 2020 OCC consent order and corresponding sanction – including

resolution of Citibank's non-compliance with the reporting and other obligations originally

imposed by the 2015 Consent Orders, and its concealment of that non-compliance – overlap with

and encompass Relator's *qui tam* allegations.[4]  In brief, the October 2020 OCC consent order

---

[3] To be sure, the Court will eventually be asked to determine the appropriate percentage relator is entitled to, but she need not demonstrate that the Government's recovery was based on her complaint, to establish her right to a reward.  *See* 31 U.S.C. §§ 3730 (d)(2) ("If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages.  The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds.").

[4] Citing the U.S. Dec., Defendant further contends that the October 2020 OCC consent order is unrelated to the 2015 consent orders because "the OCC's 2015 Consent Order concerned alleged 'deficiencies in the Bank's practices that resulted in violations of Section 5 of the Federal Trade Commission Act,'" but "the 2020 Orders [were not] based on alleged violations of Section 5 of the FTC."  Def. Opp. at 12.  Without question, the 2015 Consent Orders concerned much more than Defendant's violations of the FTC Act, and Relator's fraud allegation is based on Defendant's concealment of liability for violating a multitude of new reporting and organizational controls requirements that were imposed on Citibank after the 2015 Consent Orders – requirements that are largely still in place.

cited Citibank for a variety of regulatory compliance, risk management, and control issues, *see* Dec. Of Greg Sullivan (Dkt. #51) (U.S. Dec.") at ¶18; U.S. Opp. at 4 – many of which Relator reported to the OCC directly, and were subsumed within her *qui tam* complaint.  For example, Relator's allegations discuss these issues of Defendant's non-compliance – each of which was corroborated and resolved by the October 2020 OCC consent order, *see* Dkt. #38-5, p. 2-4:

- Failure to establish effective front-line units and independent risk management, *see* Rel. Dec. ¶¶170-171;

- Failure to establish an effective risk governance framework, *see* Rel. Dec. ¶¶172-174;

- Failure to establish enterprise-wide risk management policies,[5] standards, and frameworks to adequately identify, measure, monitor, and control risks, *see* Rel. Dec. ¶¶175-179;

- Failure to have compensation and performance management programs to incentivize effective risk management, *see* Rel. Dec. ¶¶180;

- Unsafe or unsound practices with respect to internal controls, including the lack of clearly defined roles and responsibilities and noncompliance with multiple laws and regulations, *see* Rel. Dec. ¶¶181-183;

- Unsafe or unsound practices with respect to data quality and data governance, including risk data aggregation and management and regulatory reporting, *see* Rel. Dec. ¶¶184-185);

- Failure to establish effective front-line units, independent risk management, internal audit, and control functions, *see* Rel. Dec. ¶¶184-185;

---

[5] Defendant's "enterprise-wide" risk management failures encompass Relator's fraud allegations of what amount to lesser-included offenses at the Department level – specifically, the exact same types of failures that Relator discovered within the Third-Party Vendor Risk Oversight Department, and which the 2015 Consent Orders were designed to address.  *See* U.S. Dec. ¶8 (noting that "the 2015 Consent Order required the Bank to" develop new or revise policies concerning both management of third-party vendors as well as enterprise-wide risk management).

- Inability to develop and execute on a comprehensive plan to address data governance deficiencies, including data quality errors and failure to produce timely and accurate management and regulatory reporting, *see* Rel. Dec. ¶¶186;

- Inadequate reporting to the Board on the status of data quality and progress in remediating identified deficiencies, *see* Rel. Dec. ¶¶187:

- Failure of the Board and senior management to have adequate oversight to ensure timely, appropriate actions to correct the severe and longstanding deficiencies and unsafe or unsound practices in risk management, internal controls, and data governance at the Bank, and inadequate reporting to the Board that hindered its ability to provide effective oversight, *see* Rel. Dec. ¶¶188-195.

For each of these cited failures, Relator provided the OCC with documentary evidence and continued to provide information as requested by the DOJ, the CFPB, and the OCC. *See generally*, Rel. Dec. p. 31-38. Similarly, Relator's complaint is replete with examples of internal control, regulatory compliance, and risk management failures that are essentially repeated and subsumed in the OCC's October 2020 consent order, such as:

- Manipulating audit reports and/or compliance summary reports to hide failed regulatory compliance, *see* Complaint ¶¶ 12-13, 62, 70-71, 82-89;

- Failing to implement internal controls which permitted Citibank to submit false information to the government, *see* Complaint ¶¶ 12-13, 68, 75-81;

- Failing to adhere to known and appropriate risk management controls and processes, *see* Complaint ¶¶ 63-68;

- Failing to create and maintain a reporting system to encourage reporting concerns regarding internal control, risk, and regulatory compliance, *see* Complaint ¶ 73;

- Maintaining a corporate reporting structure that permitted the manipulation of data and fraud to both occur and not be discovered, *see* Complaint ¶¶ 75-81, 84-89.

Further, although the OCC terminated the 2015 OCC consent order in 2018, *see* U.S. Dec. ¶ 10, that termination had no bearing on the 2015 CFPB consent order, nor did it relieve Citibank of the reporting obligations and other controls first imposed in 2015 by both 2015 Consent Orders – indeed, in accordance with those obligations, Defendant continues to use TPORT for tracking and reporting data.  Moreover, the termination of the 2015 OCC consent order did not release Citibank from liability for falsely certifying its compliance with those obligations, as Relator has alleged.  Notably, the Government asserts that the 2015 OCC Consent Order was terminated in November 2018 "because the OCC verified that the Bank had adopted, implemented, and adhered to the corrective actions set forth in each of the 2015 Consent Order's actionable articles and validated that the corrective actions were *effective and sustainable* in addressing the bank's deficiencies."  *Id.* (emphasis added); *see also* U.S. Opp. at 3.  Yet, by January 2020, the OCC had again sanctioned Citibank – this time for nearly $18 million – for violating the Flood Disaster Protection Act through its deficient management of third-party loan servicers that handled Defendant's mortgage loans secured by collateral in special flood hazard areas.  *See* https://occ.gov/static/enforcement-actions/ea2020-001.pdf (last visited May 20, 2022).  The OCC's subsequent $400 million sanction later that year resolved additional liabilities related to the Flood Act deficiencies.  *See* Oct. 2020 Consent Order (Dkt. #38-5) at 4 (finding that "the Bank's deficiencies in internal controls and compliance risk management have contributed to violations of laws and regulations and the OCC assessed civil money penalties . . . in 2020 based specifically on violations of the Flood Disaster Protection Act, as amended, 42 U.S.C. § 4012a(f), and its implementing regulations, specifically 12 C.F.R. § 22.7(a).").  Clearly,

Citibank's purported post-2015 corrective actions were not "effective and sustainable," and the termination of the 2015 OCC consent order did not end the Government's investigation of Citibank's non-compliance with its third-party risk management obligations, as the United States has implied. *See, e.g.*, U.S. Opp. at 4. Relator's reporting to the OCC throughout the Summer and Fall of 2019[6] is entirely consistent with the subsequent January and October 2020 OCC consent orders, which were, at least in part, rooted in Defendant's non-compliance with the reporting and other obligations initially imposed through the 2015 Consent Orders.

The Government's contrary contentions regarding the scope of the October 2020 OCC consent order have not been examined, either through an evidentiary hearing or discovery, and cannot simply be accepted as fact or serve as the basis for denying Relator's motion. *See, e.g.*, *Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 374 (8th Cir. 2015) ("To resolve the relators' claim for recovery, the district court should make findings about whether there is a factual overlap between the claim or claims settled by the government and the claims brought by the relators, such that proceeds of the settlement (or any portion thereof) should fairly be characterized as 'proceeds of the . . . settlement of the claim' brought by the relators"); *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 651 (6th Cir. 2003) (finding that whether the relator's claims overlapped with the Government's settlement was a matter to be determined by the district court via an evidentiary hearing).[7]

---

[6] The United States' Declaration inaccurately states that "[o]n September 26, 2021, certain OCC personnel interviewed Relator." U.S. Dec. at ¶11. Of course, September 26, 2021 is well past the date of the 2020 OCC consent order, and thus the Government's Declaration suggests that Relator's information could not have played any role in the corresponding 2020 OCC sanction. But, as described in Relator's Declaration, Ms. Miller first met with OCC personnel and reported Defendant's misconduct in 2019, several months *before* the OCC sanctions in January and October 2020. *See* Rel. Dec. ¶¶143-146.

[7] The United States has "reserve[d] its right under 31 U.S.C. § 3730(c)(2)(A) to dismiss the Relator's *qui tam* action." U.S. Opp. at 17, n6. However, should the Government move to dismiss Relator's *qui tam* action, Relator would be permitted to object and would have the right to a hearing before the Court. *See*

Although the Government now contends that "Relator fails to establish any factual connection or overlap between Citibank's violations as alleged in the *Qui Tam* Complaint, and the 2020 CMP that –per Relator's theory – represents the Government's alternate remedy to redress Citibank's supposed reverse false claim," U.S. Opp. at 19, it was actually the United States, not Relator, who first acknowledged the connection between Relator's disclosures and the OCC investigation that led to the October 2020 OCC Consent Order.  For example, the DOJ represented to the Court ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████[8] The post-hoc justification the United States now offers for denying Relator a reward is belied by the contemporaneous record. The Government only claimed that the *qui tam* claims are unrelated to the October 2020 OCC consent order after it had mined Relator of her relevant information, issued a sanction that encompassed her FCA claims, and realized that a whistleblower reward was due.  The FCA's alternate remedy provision was specifically designed to prevent the government from denying whistleblower rewards in this way.

---

31 U.S.C. §3730(c)(2)(A) ("The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.").

[8] An un-redacted version of Relator's Motion (Dkt. #21-2) includes specific references to correspondence that was previously filed with the Court and remains under Seal.  *See* Rel. Mot. at 11-13.

Next, the United States argues that Relator should be denied a share of the OCC sanction because "the concerns addressed in the 2020 Orders were not "of the *type* that could have been pressed under the FCA," citing *United States ex rel. Kennedy v. Novo A/S*, 5 F.4th 47 (D.C. Cir. 2021). U.S. Opp. at 12-13. The Government overreads the *Kennedy* decision. In *Kennedy,* the Government had already partially intervened in the *qui tam* lawsuit and "the United States, Novo Nordisk, and Kennedy had reached a settlement in the case in which Novo Nordisk agreed to pay $46.5 million to resolve the matter." Thus, the *Kennedy* court held, the Government's subsequent settlement with the defendant to resolve additional non-FCA claims was not an "alternative" to the *qui tam* suit. The court found that although the FCA does not define alternate remedy, "the opening clause 'notwithstanding subsection (b)' signifies that the alternate remedy is an alternative that the government can choose instead of its intervention, participation, and pursuit of a remedy in a private *qui tam* lawsuit – the subject of subsection (b). After all, an "alternate" remedy must be in place of something else." *Kennedy*, 5 F.4th at 54. Moreover, the DC Circuit found that relator "Kennedy received an 18% share (approximately $7.8 million) of the False Claims Act settlement. And importantly, Kennedy never objected to the fairness of her [FCA] settlement even though the government gave her advance notice of its separate settlement." *Id.* at 58. Under those circumstances, the DC Circuit found that the Government's separate settlement with the defendant was not an alternate remedy.

The facts here are entirely different. As an initial matter, unlike in *Kennedy*, here, the Government declined to intervene in Relator Miller's *qui tam* lawsuit; deprived her of any relator's award from that suit, by keeping her complaint under seal while the OCC fashioned the 2020 consent order and corresponding sanction; and provided Relator no advance notice of that sanction so that she could establish her entitlement to a share.

In addition, and perhaps most significantly, the *Kennedy* relator alleged that the defendant caused the submission of millions of dollars of false claims to government-funded healthcare programs, *see id.* at 51, while here, Relator Miller has alleged a reverse false claim violation. The Government contends that "Relator could not have brought a *qui tam* lawsuit against Citibank simply for unsound or unsafe banking practices, or for noncompliance with the OCC's regulations, absent some allegations of false claims or reverse false claims made to the Government."  U.S. Opp. at 13.  But as Relator discussed throughout her Motion, the 2020 OCC sanction included enhancements to account for Defendant's "concealment" of its violations, and avoidance of corresponding monetary sanctions – exactly the liability Relator's reverse false claim alleges.  Relator's *qui tam* action has been compromised precisely because the OCC has already incorporated Citibank's liability for concealment into the 2020 sanction.

Moreover, courts have read "the type [of claim] that could have been pressed under the FCA," very broadly, depending on the circumstances.  As the Government acknowledges, in *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1010-13 (9th Cir. 2001) the circuit court held that where the Government declined to intervene in a *qui tam* suit and instead chose to resolve the defendant's FCA liability through an administrative suspension and debarment process that required the defendant to make cash payments to the Government, the administrative proceeding constituted an alternate remedy.  The court stated: "[i]f the government has recovered funds lost from conduct asserted in Relator's *qui tam* action, then the government has essentially settled Relator's claims, regardless of whether it formally intervened in Relator's action or not." And in *United States ex rel. FDSI v. Bisig*, 2005 U.S. Dist. LEXIS 38316 at *12 (S.D. Ind. Dec. 21, 2005), the district court held that a criminal forfeiture proceeding constituted an alternate remedy, emphasizing that "the United States **caused a stay of the *qui tam* action** in order to

pursue criminal prosecution against the Defendant and recover substantially all of the Defendant's assets through the forfeiture proceedings." To the extent that the 2020 OCC sanction resolved Citibank's liability for concealing its violations of the requirements mandated in part by the 2015 consent orders, it concerned the exact same issue – Defendant's reverse false claims liability – alleged in the *qui tam* complaint. Relator is due her fair share of that alternate remedy.

Finally, the United States asserts that "the 2020 Orders were 'the culmination of discussions and work within OCC that long predated the OCC's receipt of Relator's Complaints in 2019,'" and that "the long-standing nature of the OCC's examination work that culminated in the 2020 Orders strongly supports the conclusion that the 2020 Orders were not simply an alternate remedy that the Government elected to pursue to redress Relator's claims." U.S. Opp. at 14. Relator recognizes that the OCC has been examining Defendant's practices for years, as evidenced by the history of civil money penalties against the bank. But the agency's prior examination of the bank does not hinder Relator's *qui tam* action. As Relator discusses in her Motion, the FCA's "government action bar" does not apply here, since the United States did not commence a civil money proceeding against Defendant before Relator filed suit. *See* Rel. Mot. at 19. That the Government may have been investigating certain aspects of Defendant's reverse false claims liability before Relator came forward and bolstered that investigation is of no consequence. *See, e.g.*, *United States ex rel. Chiba v. Guntersville Breathables, Inc.*, 421 F.Supp. 3d 1241, 1256 (N.D. Ala. 2019) (rejecting United States' "government action bar" argument and finding that the defendant's prior disclosure to the Government "does not satisfy the government action bar because prior disclosures under the applicable statutory regime do not constitute administrative civil money penalty proceedings."). Ultimately, Relator won the "race

to the courthouse," by commencing her civil action first.  *See, e.g.*, *United States ex rel. Babalola v. Sharma*, 746 F.3d 157, 163 (5th Cir. 2014) (discussing the FCA's disclosure statement, seal, and service provisions as controls designed to help ensure that "if the Government elects to pursue the case in another proceeding, it would be an alternate proceeding.  No rush to the courthouse would ensue").

## II.   Relator's Entitlement to a Relator's Share Does Not Depend on a Final Judgment of Citibank's FCA Liability

Relator agrees that, to receive a share of any alternate remedy the Government has selected, she must have had a valid, pending *qui tam* claim when the alternate remedy was recovered.  Relator further acknowledges that the validity of her *qui tam* complaint has not only been challenged by the Government in its Opposition, but by Defendant's Opposition and its Motion to Dismiss, and that the Court will need to resolve those challenges before ruling on Relator's present Motion for a Relator's Share.  *See, e.g.*, *United States ex rel. Lee v. Northern Adult Daily Health Care Ctr.*, 174 F.Supp. 3d 696, 704 (E.D.N.Y. 2016) (where "[r]elators' *qui tam* action is currently being challenged by Defendants' motion to dismiss," the court held that "[u]ntil the Court decides whether Realtors [sic] have stated a claim and have pled fraud with the requisite particularity, Relators do not have any right to recovery in their *qui tam* action, and therefore, they also lack any corresponding right to share in an alternate remedy.  Because Relators may ultimately fail to state a valid *qui tam* action, it would be premature to determine Relators' entitlement to an alternate remedy").

Yet the United States – without reference to any authority – argues that Relator must do far more than establish that her *qui tam* suit was valid; the Government asserts that Relator must **prove** her FCA allegations, through a final judgment, before receiving a share of the Government's alternate remedy recovery.  *See* U.S. Opp. at 15-16 ("Before Relator may recover

a share, the Court must determine whether she has established by a preponderance of the evidence that the defendants defrauded the United States in violation of the FCA as alleged in Relator's *Qui Tam* Complaint. . . . Only after the Court . . . enters final judgment for Relator will her entitlement to a share of the FCA judgment – and if applicable, any alternate remedy – be established"). The Government's argument is fundamentally flawed.

Of course, the FCA's alternate remedy provision exists solely because the United States is empowered to resolve defendant's False Claims Act liability through non-FCA means[9], thereby impairing relators' ability to obtain discovery, prove their *qui tam* claims, and recover damages and civil penalties for the Government through the FCA. *See, e.g.*, *United States ex rel. Health Care Fraud Detection Sys. Inc. v. Bisig*, 2005 U.S. Dist. LEXIS 38316 at *12 (S.D. Ind. Dec. 21, 2005) ("because the United States has achieved a monetary recovery from the Defendant in a manner outside of the *qui tam* action, and that recovery made an actual monetary recovery by the relator in the *qui tam* action either impossible or futile, the United States, in effect, elected to pursue its claim through an alternate remedy"). This concept is baked into the alternate remedy provision itself – which grants to the relator the "same rights in such [alternate] proceeding as [she] would have had if the [*qui tam*] action **had continued** under [the FCA]." 31 U.S.C. §3730(c)(5) (emphasis added). Relators who qualify for rewards under the FCA's alternate remedy provision generally will not have been afforded an opportunity to prove their

---

[9] This certainly includes administrative agency civil money proceedings, but can also include a variety of other means, such as suspension and debarment proceedings, *see United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1012 (9th Cir. 2001) (finding that "in some circumstances, a suspension or debarment proceeding can be an alternate remedy"), and even criminal forfeiture proceedings, *see United States ex rel. FDSI v. Bisig*, 2005 U.S. Dist. LEXIS 38316 at *20 (S.D. Ind. Dec. 21, 2005) (finding that the FCA's alternate remedy provision "ensures that the relator maintains the 'same rights' in the alternate proceeding as it would have had in the *qui tam* proceeding. These 'rights' include the right to participate in the forfeiture proceeding pursuant to § 3730(c), and the right to recover a percentage of the United States' recovery pursuant to § 3730(d)(1).").

FCA allegations, because those allegations will have been mooted by the Government's selection of an alternate remedy.  The appropriate standard is not whether a relator has proven her allegations, but whether her allegations were valid and could have possibly resulted in a recovery for the United States.  *See, e.g., United States ex rel Kennedy*, 5 F. 4th at 58 (stating that the FCA's alternate remedy provision "limits a relator's recovery from an alternate remedy pursued by the government to those types of false or fraudulent claims that the False Claims Act recognizes and for which a *qui tam* action *could have been litigated*") (emphasis added); *see also United States ex rel. Bledsoe*, 501 F.3d at 522 ("Absent a valid complaint which affords a relator the *possibility* of ultimately recovering damages, there is no compelling reason for allowing a relator to recover for information provided to the government") (emphasis added).

Moreover, Relator's further pursuit of her *qui tam* claim will almost certainly result in a double-recovery for the United States – a result the Sixth Circuit discussed in *Bledsoe*, in response to the United States' argument that a relator could still pursue her non-intervened *qui tam* claims notwithstanding the Government's alternate remedy.  The *Bledsoe* court stated:

> Indeed, the government does not provide statutory support for its argument; instead it suggests that the settlement agreement carefully preserved Relator's rights by excluding Relator's claims from the agreement and insuring that Relator could pursue his claims separately. However, this approach would lead to consequences unintended by the FCA. If indeed the government settled Relator's claims, either Defendants would assert an accord and satisfaction defense (which, if successful, would deny Relator part or all of his rightful share of the recovered funds), or Defendants would be forced to pay the civil penalties and double or treble damages associated with the very same claims for which they already had paid penalties and damages by way of the settlement. Under either result, adverse consequences (to either Relator or Defendants) would ensue that the FCA had not intended. *See* S. Rep. 99-345, at 27, 1986 U.S.C.C.A.N. at 5292 ("While the Government will have the opportunity to elect its remedy, it will not have an opportunity for dual recovery on the same claim or claims.").

*United States ex rel. Bledsoe*, 342 F.3d at 649-650.

Consistent with its flawed argument that Relator must first prove her FCA claim before she can establish her right to a share of the Government's alternate remedy, the United States also contends that Relator is not entitled to a share because her *qui tam* suit has not been impaired by the 2020 consent order, claiming that "[n]othing has precluded Relator's *qui tam* action from proceeding, and the FCA claims that Relator asserts on behalf of the United States have not been released." *See* U.S. Opp. at 16.  As discussed above, the 2020 consent order overlaps with and encompasses Relator's reverse false claims allegations, and therefore, her *qui tam* complaint is subject to a *res judicata* defense.  *See* Rel. Motion at 21-25 and n.16. Defendant agrees with Relator that the 2020 consent order resolves the *qui tam* claim; according to Citibank, the broad release in the 2020 consent order "bars" the reverse false claim allegation.[10]  *See id.*; Def. Memo Supporting Motion to Dismiss (Dkt. #39) at 17-18.  The United States argues that the 2020 consent order does not preclude Relator's *qui tam* claims because it does not formally release Citibank from FCA claims.  *See* Opp. at 16-17.  The Government offers no authority in support of this contention, as none exists.  Instead, the FCA's alternate remedy provision contemplates that the United States may be enticed to avail itself of alternate remedies and improperly attempt to circumvent its obligation to reward deserving

---

[10] Citibank argued in its Motion to Dismiss that "the 2020 Consent Order 'releases and discharges the Bank from all potential liability for a cease and desist penalty order that has been *or might have been asserted* by the OCC based on the practices . . . described in Article II of this Order.'  The 'practices . . . described in Article II' in turn include alleged 'failure to establish effective . . . independent risk management,' 'failure to establish an effective risk governance framework,' and failure of 'risk management policies, standards, and frameworks.'  Miller's allegations fall squarely within the broad scope of this release," MTD at 18 (emphasis added by Defendant).  Yet in its brief opposing Relator's motion for an award, Citibank now contends – without explanation – that "the 2020 Orders are not an alternate remedy to Miller's *qui tam* lawsuit because they had nothing to do with Miller's FCA claims or the information she provided to the Government."  Def. Opp. at 11 (internal citations omitted).

whistleblowers.  And courts have upheld relators' right to a share of the Government's alternate remedies – without regard for whether the United States intervened in the *qui tam* suit and agreed that the alternate remedy provision applied.  *See, e.g.*, *United States ex rel. Bledsoe v.*, 342 F.3d at 648-649 ("the government would frequently carry the incentive to decline to intervene in an action and, having been apprised of possible FCA violations by a private citizen, to independently pursue an investigation of the alleged FCA violator(s).  Such a result would not further Congress' legislative intent that the government and private citizens collaborate in battling fraudulent claims, and it would impede, not further, Congress' legislative intent to encourage private citizens to file *qui tam* suits"); *United States ex rel. Barajas*, 258 F.3d at 1010 ("An alternate remedy under §3730(c)(5) is a remedy achieved through the government's pursuit of a claim after it has chosen not to intervene in a qui tam relator's FCA action").

The relevant inquiry is not whether the United States is willing to acknowledge that an alternate remedy has resolved a defendant's FCA liability – indeed, the alternate remedy provision envisions that the Government will at times be reluctant to do so – but whether the remedy, in fact, has had that effect.  *See*, *e.g.*, *United States ex rel. Rille*, 803 F.3d at 374 (referencing *Bledsoe* and announcing: "[w]e agree with the Sixth Circuit that these proceeds of 'the claim' must extend to proceeds of a settlement in which 'the conduct contemplated in the settlement agreement . . . overlap[s] with the conduct alleged in [the] Relator's complaint.' Otherwise, the government could deprive the relator of his right to recover simply by recasting the same or similar factual allegations in a new claim or by pursuing the substance of the relator's claim in an alternate proceeding").

In *Bledsoe*, the United States employed a similar tactic as it has here, as the Government argued that the settlement agreement with the defendant did not impair the relator's FCA claims,

because the agreement "'specifically reserved and excluded' claims asserted in Relator's *qui tam* action from the agreement's 'scope and terms.'"  *United States ex rel. Bledsoe v.*, 342 F.3d at 639, 649.  But the Sixth Circuit held that the settlement agreement still constituted an alternate remedy, finding that "[i]f the government has recovered funds lost from conduct asserted in Relator's *qui tam* action, then the government has essentially settled Relator's claims, regardless of whether it formally intervened in Relator's action or not. The FCA provides that a relator is entitled to 15-25% of the proceeds when the government has settled the claims stemming from a relator's valid *qui tam* suit.  There is no language in the FCA suggesting that a relator's statutory right to a share of the proceeds from the settlement of claims he or she had asserted may properly be abrogated by an agreement to which the relator was not a party."  *Id.* at 649.  The same is true here.  Even if the release provision in the 2020 consent order is deemed dispositive, the fact is that Relator's ability to pursue her reverse false claim allegation has been impaired.  Thus, she is entitled to a share of the Government's alternate remedy.

**III.    Relator Pled a Viable Reverse False Claim Allegation**

Despite the United States' insistence that Relator's reverse false claims allegations "rely on a theory that Citibank made reverse false claims to the Government by improperly avoiding an obligation to pay regulatory fines or penalties associated with either its supposed noncompliance with the 2015 Orders, or with allegedly deficient third-party risk management practices that Relator observed," Opp. at 17, as Relator made clear in her Motion, her fraud claim is **not** based on a Defendant's avoidance of fines for potential regulatory violations.  Instead, Relator has alleged that Citibank violated multiple newly agreed-upon requirements incorporated into the 2015 consent orders and lied to the Government about its non-compliance to avoid not only fines for its underlying regulatory violations, **but additional penalties for violating the consent orders themselves** – which give rise to reverse false claims liability.  Thus, the United

States is both wrong and misleading when it contends that "Citibank has only an obligation to obey the law, and Relator has identified no required obligation to pay a penalty to the Government for a violation of the law before one is imposed."  Citibank was not only required to obey the law, but the additional requirements of the 2015 consent orders as well.  The United States cites *United States ex rel. Kasowitz v. Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 725-28 (D.C. Cir. 2019) in support of its argument, but that opinion exemplifies Relator's position.  In *Kasowitz*, the circuit court determined that the reverse false claim allegation failed because it was based on "regulatory reporting requirements," which did not create an "obligation" for FCA purposes, and because the affected federal agency's "core concern" was regulatory.  *Id.*  But here, because of the 2015 consent orders, the OCC and the CFPB had both regulatory **and** contractual interests in Citibank's conduct.  Defendant's misrepresentations regarding its compliance with the 2015 consent orders subjects the bank to liability under the FCA's reverse false claims provision.

According to the Government, because the additional penalties created by the 2015 consent orders were unfixed and contingent, they cannot result in reverse false claims liability. *See* U.S. Opp. at 17-19.  The Government again misstates the law.  Citing *United States ex rel. Simoneaux v. E.I. DuPont de Nemours & Co.*, 843 F.3d 1033 (5th Cir. 2016) – yet another distinguishable and non-controlling case alleging reverse false claims liability based on allegations of regulatory non-compliance – the Government argues that "[f]or liability to attach, there must be an established duty to pay money and, in the enforcement context where the Government has not, in fact, assessed penalties, there is no such duty."  U.S. Opp. at 18.  As explained in Relator's Motion – which the Government's brief ignored – contingent liabilities based on violations of implied contractual requirements can give rise to reverse false claims.

While the court in *Simoneaux* recognized that in 2009 Congress amended the FCA and clarified the reverse false claims provision by defining "obligation," it ultimately concluded that contingent obligations are not actionable, based on an April 22, 2009 floor statement by Senator Jon Kyl.  But the *Simoneaux* court, and the United States in its Opposition, have ignored the May 18, 2009 floor statement by Rep. Howard Berman – issued two days before the FCA amendment became law – in which the congressman verified that "[t]he amendments also define the term 'obligation' to include fixed and **contingent duties** owed to the Government," and seek to correct judicial misinterpretations to the contrary.  155 Cong. Rec. No. 82 at E1295, E1299 (Extension of Remarks of Rep. Berman) (emphasis added).  Rep. Berman's floor statement is consistent with the Senate Report that was issued with the FERA legislation, which observes that

> [t]his legislation addresses current confusion among courts that have developed conflicting definitions of the term 'obligation' in Section 3729(a)(7).  **The term 'obligation' is now defined under new Section 3729(b)(3) and includes fixed and contingent duties owed to the Government** – including fixed liquidated obligations such as judgments, and fixed, unliquidated obligations such as tariffs on imported goods.  It is also noteworthy to restate that while the new definition of **'obligation' expressly includes contingent, non-fixed obligations**, the Committee supports the position of the Department of Justice that current section 3729(a)(7) 'speaks of an 'obligation,' not a 'fixed obligation.'  **By including contingent obligations such as, 'implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship,'** this new section reflects the Committee's view, held since the passage of the 1986 Amendments, that an 'obligation' arises across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that 'results in a duty to pay the Government money, whether or not the amount owed is yet fixed.'

Sen. Rep. No. 111-10, at 13-14 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430, 440-441 (all emphasis added).  While Senator Kyl focused on unestablished, unassessed penalties for regulatory violations, a more comprehensive review of the applicable legislative history makes clear that the amendment he offered did not remove all contingent liabilities – and in particular,

contingent liabilities arising from implied contractual relationships, like those at issue here and specifically referenced in the definition of "obligation" – from the purview of the FCA.

This Court should follow those decisions that have correctly interpreted the amended reverse false claims provision, and held that unassessed, contingent liabilities gave rise to reverse false claims liability.  For example, in *United States ex rel. Boise v. Cephalon, Inc.*, 2015 U.S. Dist. LEXIS 94448 (E.D. Pa. July 21, 2015), the district court found that the defendant's "obligation to pay stipulated penalties under [a corporate integrity agreement] cannot be construed as arising only when the [government] demands payment of those penalties." Similarly, in *United States ex rel. Ruscher v. Omnicare, Inc.*, 2014 U.S. Dist. LEXIS 123831 (S.D. Tex. Sept. 5, 2014), the district court determined that where – as here – the relationship between a defendant and the government is governed by statute as well as by a contract that imposed "additional duties not required by statute, and **authorized** additional penalties in case of breach, [a] decision by the [government] that Stipulated Penalties are 'appropriate' is identical to the decision by any contracting party to sue for breach. The fact that some discretion is involved in that decision does not preclude False Claims Act liability") (emphasis added).

## CONCLUSION

For the foregoing reasons, the Court should grant Relator's Motion for an award of a *qui tam* relator's share.

Dated:  Garden City, New York

   May 20, 2022

   Respectfully submitted,

   **VALLI KANE & VAGNINI LLP**

   By: _/s/Sara Wyn Kane_

   Sara Wyn Kane
   skane@vkvlawyers.com
   Robert J. Valli, Jr.
   rvalli@vkvlawyers.com
   600 Old Country Road
   Garden City, New York 11530
   Tel: (516) 203-7180
   Fax: (516) 706-0248

   **MEHRI & SKALET, PLLC**
   Richard E. Condit*
   rcondit@findjustice.com
   Cleveland Lawrence III*
   clawrence@findjustice.com
   C. Ezra Bronstein*
   ebronstein@findjustice.com
   2000 K St. NW, Suite 325
   Washington, DC 20006
   Tel: (202) 822-5100
   Fax: (202) 822-4997

   _Attorneys for Relator_

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2022 a true and correct copy of Relators' Reply in Further

Support of Motion for an Award of a Qui Tam Relator's Share (unredacted version) was served

via electronic mail all counsel of record and on the United States.

Date:   May 20, 2022


*/s/ Sara Wyn Kane*
Sara Wyn Kane.

22